## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **MARIO CASTRO,** | : | No. 3:23cv342 |
| **Plaintiff** | : | |
| | : | **(Judge Munley)** |
| **v.** | : | |
| | : | |
| **CHRISTOPHER DEBIAS, a law** | : | |
| **enforcement officer now or formerly** | : | |
| **working for the Borough of Hazleton,** | : | |
| **Pennsylvania, in his personal** | : | |
| **capacity only,** | : | |
| **Defendant** | : | |

:::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

## <u>MEMORANDUM</u>

Plaintiff Mario Castro recorded his attempts to obtain a police report from the Hazleton City Police Department. After his efforts failed, he directed a profane insult at a police officer, Defendant Christopher Debias. A confrontation occurred. Debias arrested Castro and cited him for disorderly conduct. The citation did not result in a conviction. Castro then filed this action pursuant to 42 U.S.C. § 1983 ("Section 1983") for false arrest and retaliatory arrest, alleging violations of his First and Fourth Amendment rights. Debias invoked qualified immunity in a motion to dismiss. (Doc. 6).

Based on the parties' recordings of the incident, the court converted Debias's motion to one for summary judgment. After resolution of several subsequent discovery issues related to that conversion, Debias filed the videos

of record.  The issue of the defendant officer's qualified immunity is now ripe for a decision.

**Background**

Plaintiff Mario Castro records his interactions with police.[1]  He has been cast as a police auditor for maintaining a YouTube channel called "Not the End of Freedom." (Doc. 22, Def. Br. in Supp. Prot. Order at p. 4, n. 1).  In July 2021, an individual assaulted Castro at a Kentucky Fried Chicken restaurant in Hazleton, Pennsylvania, (hereinafter "KFC incident").  (Doc. 40-2, Debias Video 1, 9:49-10:26).  A sergeant from the Hazleton City Police Department responded to the KFC incident. (Id.)  Assault charges were ostensibly pending against that other individual.  (Id.)

On July 23, 2021, Castro travelled to Hazleton City Hall where the Hazleton City Police Department is headquartered.  Castro wore a GoPro video camera on his chest. (Id. at 0:35).  Castro sought a police report regarding the KFC incident. (Id. at 3:28-4:27).

Castro entered the building using the rear entrance of Hazleton City Hall. (Doc. 40-3, Castro Video, 0:19-0:38).  Castro then proceeded through a small elevator vestibule into the first-floor hallway. (Id. at 0:38-0:44).  From there,

---

[1] All facts from the record are construed in a light most favorable to plaintiff as the nonmoving party. See Daniels v. Sch. Dist. of Philadelphia, 776 F.3d 181, 187 (3d Cir. 2015)(citation omitted).

2

Castro walked over to a nearby door marked with a seal for the Hazleton City Police Department. (Id. at 0:41-0:49)  Castro called the department using a courtesy phone. (0:49-1:09)  When his call was answered, Castro indicated that he needed a police report. (Id. at 1:09-1:32).

After placing the call, Castro walked around the first floor of City Hall for approximately two minutes. (Doc. 40-3, Castro Video, 1:32-3:28).  At one point, he walked over to a wall-mounted box labeled "Donations Hazleton Police Department." (Id. at 3:06-3:21).  Castro remarked, "donations," and then stated, "*donaciones para los extorsionistas.*"[2] (Id.)

Shortly thereafter, Debias, a Hazleton police officer, emerged from behind a badge-access door and walked toward the plaintiff.  (Id. at 3:28).  This exchange followed from the perspective of Castro's bodycam:

| | |
|---|---|
| Castro: | Yes sir.  For an incident that happened on the Thirteenth, I need a police report. |
| Debias: | What incident that happened on the Thirteenth? |
| Castro: | I was assaulted. |
| Debias: | Did this…was this already reported? |
| Castro: | Yeah.  Police was involved. |
| Debias: | Who was the officer? |
| Castro: | Babula, I think. |

---

[2] That statement may be translated to "donations for the extortionists."

3

Debias:    Ok. You'll have to talk to him about that case.

Castro:    So, no one can discuss anything about that?

Debias:    No. Only the investigating officer.

Castro:    What time he be in?

Debias:    He's on vacation…until the beginning of August.

Castro:    So no one, I have, have nothing, uh…

Debias:    If he's already investigating it, there's, there's nothing anybody else…

Castro:    *[speaking over Debias]* I don't know if he's investigating it because…

Debias:    *[speaking over Castro]* Did you report it to him?

Castro:    Well, yeah. He was there.

Debias:    He talked to you face to face?

Castro:    Yeah, but he never contacted me, and it's been, what, already some days. And I haven't heard anything from you guys.

Debias:    *[speaking over Castro]* Ok. I'm sure that's not the only thing he has going on. I'm sure he has other stuff to deal with too.

Castro:    Yeah, but what about me? What about me? I need…I need…

(Id. at 3:28-4:28).

Debias then turned away from Castro and walked back toward the door for the police department. As he turned, Debias told Castro: "You can talk to…Sergeant Babula when he comes back, OK?" (Id. at 4:27-4:31).

4

Simultaneously, Castro followed Debias toward the door and asked: "What's your name and badge number? What's your name and badge number?" (Id. at 4:29-4:32).

Debias, opening the secured door, responded, "1-6-2." (Id. at 4:31:4:32). Castro then asked, "What's your name?" (Id. at 4:32-4:33).

Debias, now stepping into the police department hallway with his back turned to Castro, stated again, "1-6-2." (Id. at 4:33-4:34). Debias's bodycam video indicates that he also told Castro to have a good day. (Doc. 40-2, Debias Video 1, 1:40-1:41).

Castro sidestepped with his camera pointed into the police department hallway and stated: "That's your name? 1-6-2?" (Doc. 40-3, Castro Video, 4:34:4:36). As the door closed, Castro called Debias an "asshole," and turned toward the exit at the rear of Hazleton City Hall. (Id. at 4:36-4:38). Castro walked several steps toward the exit. (Id. at 4:38-4:41). He then turned around to face Debias reemerging from the police department door, pointing his finger at the plaintiff. (Id. at 4:41-4:44).

As Debias walked toward Castro, the defendant warned: "I'd watch your step on this. You don't want to get arrested. Watch your step! I told you what to do, OK! That's going to be it." (Id. at 4:44-4:47).

Castro, starting before Debias finished, responded: "Go ahead, arrest me. Go ahead, arrest me. Arrest me! What you going to do? What you going to do? What you going to do?" (Id. at 4:46-4:52).  Castro moved his arms away from his sides with his palms open and facing the officer. (Doc. 40-2, Debias Video 1, 1:52-2:01)

After Castro stated "arrest me" the third time, Debias pointed at the direction of the exit and commanded: "Leave City Hall. Leave City Hall now." (Doc. 40-3, Castro Video, 4:50-4:52).  Debias also advised, "I'm not going to tell you again." (Id. at 4:52:4:53).

Castro countered: "You don't want to do your job. You don't like to do your job." (Id. at 4:53:4:55).  Debias responded: "I gave you your information. I told you what you need to do." (Id. at 4:55-4:57).  Castro then stated, "I told you…" (Id. at 4:56-4:57).

At this point, Debias walked even closer to Castro, pointed toward the exit, and shouted: "Out! Leave!" (Id. at 4:57-4:58).  Simultaneously, Castro stated: "Go ahead, touch me." (Id. at 4:57-4:58).  Debias then placed his hands on Castro and said, "turn around, go ahead," as the plaintiff's bodycam turned slightly from the contact. (Id. at 4:58-5:00).

Castro then shouted: "You assaulted me right now!" (Id. at 5:00-5:02). Debias, with his hands still on the plaintiff, pushed Castro toward the exit. (Id. at

6

5:02-5:04).  Castro yelled, "Why are you pushing me? Why are you pushing me?"
(Id. at 5:02-5:04).  Debias, still pushing Castro, stated, twice: "Listen to me." (Id.
at 5:04-5:06).  Castro yelled again, twice: "Why are you pushing me?" (5:04-
5:06).

　　"Stop," Debias commanded. (Id. at 5:06).  Castro responded: "No, I stop
nothing." (Id. at 5:06-5:08).  Debias continued: "I told you what you needed to
do."  Castro yelled: "No, sir!" (Id. at 5:08-5:09).  Debias then began to shout even
louder at the plaintiff. (Id. at 5:09-5:10).  Castro's bodycam video, however, has a
gap in the encounter at this point.  It resumes with the sounds of Castro being
placed in handcuffs in the elevator vestibule area at the rear exit of City Hall.  (Id.
at 5:10-5:15).

　　Debias's bodycam video fills the above gap.  With his right hand on
Castro's left shoulder and his left index finger in the plaintiff's face, Debias
shouted at him: "Listen to me!" (Doc. 40-2, Debias Video 1, 2:14-2:16).  Castro
shouted back, matching the officer's volume: "Fuck you!" (Id. at 2:15-2:16).

　　Debias then spun Castro around, grabbed the plaintiff by his suspender-like
camera harness, and pushed the plaintiff in the direction of the rear exit. (Id. at
2:16-2:18).  As he was being pushed, Castro opened the door into the elevator
vestibule area as Debias released the plaintiff's camera harness, snapping it

7

against the plaintiff's back. (Id. at 2:18-2:19).  The back door to Hazleton City Hall appeared to be open with Castro only a step or two away from that door. (Id.)

Facing each other again, Castro and Debias shouted:

| | |
|---|---|
| Castro: | *[pointing at his bodycam]* "You're on fucking video right now." |
| Debias: | *[pointing at the open door]* "Leave the property! |
| | *[pointing at his bodycam]* So are you!" |
| Castro: | "Fuck you!" |
| Debias: | *[pointing at the open door]* "Get out!" |
| Castro: | "Fuck you!" |

(Id. at 2:19-2:24).

Debias then turned Castro around in the direction of a brick wall with the defendant's right hand grabbing the back of the plaintiff's left shirt sleeve. (Id. at 2:24-2:25).  From the perspective of Debias's bodycam video, Castro was either pushed or he bumped his own chest against the brick wall.  Castro yelled: "You fucking broke my camera! You just broke my camera!" (Id. at 2:25-2:30).

Debias then placed Castro in handcuffs, now joined by a city police detective. (Id. at 2:30-2:39).  The officers walked Castro back into City Hall and into a police department holding cell. (Id. at 2:39-3:10).

Debias's body camera continued recording for approximately fourteen (14) more minutes.  (Id. at 3:10-17:14).  As for the remainder of the encounter, Debias

8

and the detective removed Castro's handcuffs. (Id. at 3:59-4:10).  Castro

continued to speak to Debias, the unidentified city police detective, and another

Hazleton officer, Christopher Zubris, as the police searched the plaintiff's

person.[3] (Id. at 4:20-5:20).

During this exchange, Debias stated to Zubris and the detective: "[T]his is a

routine with him. I couldn't tell you how many times." (Id. at 5:20-5:24).

Subsequently, Castro took a seat in the holding cell at Debias's request but then

did not respond to commands to remove his shoes. (Id. at 5:31-5:41).  Debias

stated: "We'll do this the hard way. Keep an eye on him." (Id. at 5:41-5:43).

Debias went to retrieve other restraints. (Id. at 5:43-6:11).

Returning to the holding cell, Debias spoke with the detective.  Debias

stated: "It's a regular issue with him.  He comes in, starts issues, you know what I

mean, doesn't get the answers he likes, and this is what happens." (Id. at 6:11-

6:24).  Castro asked to know the reason for his arrest.  (Id. at 6:30-6:33).  The

detective responded: "Disorderly conduct." (Id. at 6:33-6:34).

---

[3] Zubris is identified in Debias's bodycam video as "1-9-8" when Castro requested his badge number. (Doc. 40-2, Debias Video 1, 4:41-4:43).  A computer aided dispatch report indicates that this badge number belongs to Zubris. (Doc. 40-6, Def. Appx. 6).

Ultimately, the officers did not use the other restraints that Debias retrieved, as Castro responded to Zubris's attempts to deescalate the situation. (Id. at 6:34-8:00). Zubris then conducted a strip search of the plaintiff. (Id. at 8:00-9:43).

Following the strip search, Debias then engaged Zubris in discussion about Castro outside the holding cell. Zubris advised Debias about the KFC incident:

Debias:      Were you working on the Thirteenth?

Zubris:      Yes.

Debias:      I don't know. He's been in, I don't know how many times.

Zubris:      I was working the day this happened.

Debias:      The latest one was on the Thirteenth. I guess he talked to Babula about an assault or something.

Zubris:      Yes. He was up at KFC. It was between him and **[redacted]**. Babula, I believe, was doing charges on **[redacted]** for the incident. This guy…

Debias:      I didn't know anything about this. And you know, he didn't like the answer I was giving him. And I dealt with him before, and this is what it turned into.

(Id. at 9:49-10:26).

After additional discussion between Debias and Zubris about the current incident, Debias said: "That's what this is about…again with him." (Id. at 10:26-11:00).

Moreover, after Debias looked into Castro's other matters at a desk area, he remarked to another officer: "Every single time he comes in here with his

10

GoPro camera on, he tries to bait you into something, starts acting like an idiot. [inaudible]. This is the fourth time I've dealt with him over this shit. I'm fucking tired of it." (Id. at 14:19-14:41). Debias subsequently issued Castro a non-traffic citation for violating 18 PA. CONS. STAT. § 5503(a)(4), Pennsylvania's disorderly conduct statute. (Doc. 40-1). Castro alleges that he was not convicted of the offense. (Doc. 1, Compl. ¶ 31).

Based on the above incident, Castro filed a two-count complaint against Debias pursuant to Section 1983. (See id.) Count I of Castro's complaint asserts a cause of action for false arrest in violation of his Fourth Amendment rights. (Id. ¶¶ 33-34). In Count II, plaintiff brings a claim for retaliatory arrest in violation of his First and Fourth Amendment rights. (Id. ¶¶ 36-40). Castro did not attach a copy of his video to the complaint.

Debias initially filed a motion to dismiss plaintiff's Section 1983 claims pursuant to Federal Rule of Civil Procedure 12(b)(6). (Doc. 6). In doing so, Debias asserted qualified immunity as a shield to this action. (Doc. 7, Def. Br. in Supp. MTD at 4-13). Based on the existence of videos of the incident recorded by the parties, the court converted Debias's motion to dismiss to a motion for summary judgment. (Doc. 16). The parties proceeded with discovery motion practice. Castro filed a motion to take Debias's deposition, which was denied. (Docs. 23, 27-28). Debias also filed two motions attempting to restrict public

11

access to the police bodycam videos. (<u>See</u> Docs. 21-22, 29, 33).  Debias's

motions were largely denied, except for a permitted redaction of the name of the

non-party involved in the KFC incident with the plaintiff. (Docs. 27-28, 37-38).

On November 22, 2024, Debias filed a brief in support of summary

judgment, (Doc. 39), and a statement of facts with exhibits as required by the

Rules of Court for the Middle District of Pennsylvania ("Local Rules"), (Doc. 40).

The following exhibits comprise the entire summary judgment record: 1) the

citation issued to Castro, (Doc. 40-1); 2) Debias's bodycam videos with the

permitted redactions, (Docs. 40-2, 40-4); 3) Castro's video recording of portions

of the incident from his own body camera, (Doc. 40-3); 4) the bodycam video of

another officer (not Zubris), (Doc. 40-6); and 5) a computer aided dispatch report

from the incident, (Doc. 40-7).  Castro then responded with a brief in opposition

on December 13, 2024. (Doc. 41).  Debias did not file a reply brief within the time

afforded to him by the Local Rules.  Accordingly, the qualified immunity issues in

this case are ripe for a decision.

**Jurisdiction**

As this action was filed pursuant to Section 1983, the court has jurisdiction

under 28 U.S.C. § 1331 ("The district courts shall have original jurisdiction of all

civil actions arising under the Constitution, laws, or treaties of the United

States."). Furthermore, the court has jurisdiction pursuant to 28 U.S.C. §

1343(a).

## Standard of Review

Debias's initial motion to dismiss based upon qualified immunity is now

being addressed as a motion for summary judgment with consideration of the

bodycam videos and police department records.[4]  Granting summary judgment is

proper " 'if the pleadings, depositions, answers to interrogatories, and admissions

on file, together with the affidavits, if any, show that there is no genuine issue as

to any material fact and that the moving party is entitled to judgment as a matter

of law.' " See Knabe v. Boury Corp., 114 F.3d 407, 410 n. 4 (3d Cir.1997)

(quoting FED. R. CIV. P. 56(c)).  "[T]his standard provides that the mere existence

of *some* alleged factual dispute between the parties will not defeat an otherwise

properly supported motion for summary judgment; the requirement is that there

be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S.

242, 247–48 (1986) (emphasis in original).

---

[4] Qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation[.]" Mitchell v. Forsyth, 472 U.S. 511, 526 (1985).  And the Supreme Court of the United States has repeatedly "stressed the importance of resolving immunity questions at the earliest possible stage in litigation."  Hunter v. Bryant, 502 U.S. 224, 227 (1991)(citations omitted).

**Analysis**

**1. Qualified Immunity**

"The purpose of [Section] 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails." Wyatt v. Cole, 504 U.S. 158, 161 (1992). "Police officers, embodying the authority of the state, are liable under § 1983 when they violate someone's constitutional rights, unless they are protected by qualified immunity." Curley v. Klem, 499 F.3d 199, 206 (3d Cir. 2007). The doctrine of qualified immunity shields government officials performing discretionary functions "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). "The qualified immunity standard 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.' " Hunter, 502 U.S. at 229 (quoting Malley v. Briggs, 475 U.S. 335, 343 (1986)).

Qualified immunity "is an *immunity from suit* rather than a mere defense to liability[.]" Mitchell, 472 U.S. at 526 (emphasis in original). Thus, the defendant bears the burden of establishing that he is entitled to qualified immunity. Burns v. Pa. Dep't of Corr., 642 F.3d 163, 176 (3d Cir. 2011)(citing Harlow, 457 U.S. at 819). On a motion summary judgment, this means defendant officers must

show: 1) that there is no genuine dispute of material fact to refute their contention that they did not violate plaintiff's rights; or 2) if a violation of a right occurred, that reasonable officers could not have known that their conduct constituted such a violation when they engaged in it.  See Halsey v. Pfeiffer, 750 F.3d 273, 288 (3d Cir. 2014)).

The two-part qualified immunity test is well settled. Montemuro v. Jim Thorpe Area Sch. Dist., 99 F.4th 639, 642 (3d Cir. 2024) (citing Anglemeyer v. Ammons, 92 F.4th 184, 188 (3d Cir. 2024)).  Under the first prong, a court must decide whether the plaintiff can demonstrate a violation of a constitutional right. Pearson v. Callahan, 555 U.S. 223, 232 (2009)(citation omitted).  Under the second prong, "the court must decide whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." Id. (citation omitted).

In considering qualified immunity, the court may address the prongs of this test in any order.  Id. at 236.  Beginning a qualified immunity analysis with the first prong remains "often beneficial." Id.; see also Halsey, 750 F.3d at 287 ("Normally…in considering a qualified immunity issue, [the court asks] whether a defendant's conduct violated a [plaintiff's] statutory or constitutional rights before addressing whether that law had been established at the time of the violation so that the unlawfulness of the conduct should have been apparent to an objectively

reasonable official.")(citations omitted).  The court will thus start with the substantive constitutional issues in this case.

### a.    Whether Debias Violated Castro's Constitutional Rights

Under the first prong of the qualified immunity analysis, the court asks, "if the facts, '[t]aken in the light most favorable to the party asserting the injury, ... show the officer's conduct violated a constitutional right.' " Lozano v. New Jersey, 9 F.4th 239, 245 (3d Cir. 2021)(quoting Saucier v. Katz, 533 U.S. 194, 201 (2001)).

Castro's first claim is for false arrest.  "[C]laims for false arrest challenge 'detention without legal process[.]' " Rivera-Guadalupe v. City of Harrisburg, 124 F.4th 295, 303 (3d Cir. 2024)(citing Wallace v. Kato, 549 U.S. 384, 389 (2007)).

Debias arrested Castro without a warrant.  "To satisfy the Fourth Amendment, a warrantless arrest must be based on probable cause that a crime has been or is being committed." Revell v. Port Auth. of New York, New Jersey, 598 F.3d 128, 137, n. 16 (3d Cir. 2010)(citing Devenpeck v. Alford, 543 U.S. 146, 152 (2004)); see also Barna v. City of Perth Amboy, 42 F.3d 809, 819 (3d Cir. 1994)).  Moreover:

> The determination that probable cause exists for a warrantless arrest is fundamentally a factual analysis that must be performed by the officers at the scene. It is the function of the court to determine whether the objective facts available to the officers at the time of arrest were

> sufficient to justify a reasonable belief that an offense was being committed.

United States v. Glasser, 750 F.2d 1197, 1206 (3d Cir. 1984)(citing Beck v. Ohio, 379 U.S. 89, 95 (1964)).

Castro's second claim is for retaliatory arrest. " '[A]s a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions' for engaging in protected speech." Nieves v. Bartlett, 587 U.S. 391, 405 (2019)(quoting Hartman v. Moore, 547 U.S. 250, 256 (2006)). "If an official takes adverse action against someone based on that forbidden motive, and non-retaliatory grounds are in fact insufficient to provoke the adverse consequences, the injured person may generally seek relief by bringing a First Amendment claim." Id. (internal quotation marks and citations omitted). But, absent facts fitting within a narrow exception, "the existence of probable cause 'generally defeat[s] a First Amendment retaliatory arrest claim.' " Falcone v. Dickstein, 92 F.4th 193, 210 (3d Cir. 2024) (quoting Nieves, 587 U.S. at 405).

In this case, Debias cited Castro for violating 18 PA. CONS. STAT. § 5503(a)(4), a disorderly conduct offense in the Commonwealth of Pennsylvania.[5]

---

[5] Castro's disorderly conduct charge was graded as a summary offense. (Doc. 40-1). Disorderly conduct can be graded as a misdemeanor of the third degree "if the intent of the actor is to cause substantial harm or serious inconvenience, or if he persists in disorderly conduct after reasonable warning or request to desist." 18 PA. CONS. STAT. § 5503(b). When disorderly conduct constitutes a summary offense under Pennsylvania law, a police officer has "upon view...the right of arrest without warrant upon probable cause when there is ongoing conduct that imperils the personal security of any person or endangers public or private property[.]" 42 PA. CONS. STAT. § 8902(a)(1).

(Doc. 40-1). In the citation, Debias described the nature of the offense by tracking the language of this statutory subsection without additional description of the incident. (Id.)

Nonetheless, "[b]ecause probable cause is an objective standard, an arrest is lawful if the officer had probable cause to arrest for any offense, not just the offense cited at the time of arrest or booking." District of Columbia v. Wesby, 583 U.S. 48, 55, n. 2 (2018) (citing Devenpeck v. Alford, 543 U.S. 146, 153–155 & n. 2 (2004)). In support of summary judgment, Debias argues that Castro violated each subsection of the state disorderly conduct statute. (Doc. 39, Def. Br. in Supp. at 13). Accordingly, the court refers to the entire offense definition in 18 PA. CONS. STAT. § 5503(a), not just Section 5503(a)(4):

> A person is guilty of disorderly conduct if, with intent to cause public[6] inconvenience, annoyance or alarm, or recklessly creating a risk thereof, he:
>
> (1) engages in fighting or threatening, or in violent or tumultuous behavior;
>
> (2) makes unreasonable noise;
>
> (3) uses obscene language, or makes an obscene gesture; or

---

[6] "Public" is defined as: "affecting or likely to affect persons in a place to which the public or a substantial group has access; among the places included are highways, transport facilities, schools, prisons, apartment houses, places of business or amusement, any neighborhood, or any premises which are open to the public." 18 PA. CONS. STAT. § 5503(c).

> > (4) creates a hazardous or physically offensive condition by any act which serves no legitimate purpose of the actor.

18 PA. CONS. STAT. § 5503(a).

State law defines the offense of disorderly conduct.  "Section 5503 is aimed at protecting the *public* from certain enumerated acts." Commonwealth v. Fedorek, 946 A.2d 93, 100 (Pa. 2008)(emphasis in original).  However, Section 5503 "accomplishes this aim by focusing upon certain *individual* acts, which, if pursued with the intent to cause public inconvenience, annoyance, or alarm, or recklessly creating a risk thereof, constitute the offense of disorderly conduct. These individual acts focus upon the offender's *behavior*." Id. (emphasis in original).

Furthermore, "whether a defendant's words or acts rise to the level of disorderly conduct hinges upon whether they cause or unjustifiably risk a public disturbance. 'The cardinal feature of the crime of disorderly conduct is public unruliness which can or does lead to tumult and disorder.' " Commonwealth v. Hock, 728 A.2d 943, 946 (Pa. 1999)(quoting Commonwealth v. Greene, 189 A.2d 141, 144 (Pa. 1963)).  This analysis thus also considers whether Castro's conduct caused or unjustifiably risked a public disturbance at Hazleton City Hall.

And, to the extent that Section 5503 regulates Castro's speech at City Hall, First Amendment law is also implicated.  Pennsylvania law recognizes this

19

fundamental concern. <u>Commonwealth v. Mastrangelo</u>, 414 A.2d 54, 58 (Pa. 1980)("the disorderly conduct statute may not be used to punish anyone exercising a protected First Amendment right.").

Thus, "[w]hen the regulated conduct consists of speech, the [disorderly conduct] statute must 'be carefully drawn or authoritatively construed to punish only unprotected speech and not be susceptible of application to protected expression.' " <u>Johnson v. Campbell</u>, 332 F.3d 199, 211 (3d Cir. 2003)(quoting <u>Gooding v. Wilson,</u> 405 U.S. 518, 522 (1972)). "The First Amendment on the whole offers broad protection for speech, be it unpleasant, disputatious, or downright offensive." <u>Id.</u> at 212. The "function of free speech under our system of government is to invite dispute…[and] may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger." <u>Terminiello v. Chicago</u>, 337 U.S. 1, 4, (1949)).

Speech that does not receive First Amendment protection includes "the lewd and obscene, the profane, the libelous, and the insulting or 'fighting' words—those which by their very utterance inflict injury or tend to incite an immediate breach of the peace." <u>Chaplinsky v. New Hampshire</u>, 315 U.S. 568, 572 (1942)). "On the specific subject of 'profane' words, the Supreme Court has held that even those words alone, unaccompanied by any evidence of violent

arousal, are not 'fighting words,' and are therefore protected speech." Johnson, 332 F.3d at 212.

Section 5503(a)(1) has been referred to by the federal courts as the "fighting words" provision of Pennsylvania's disorderly conduct statute. See Pringle v. Ct. of Common Pleas, 778 F.2d 998, 1001 (3d Cir. 1985); Clifton v. Borough of Eddystone, 824 F. Supp. 2d 617, 625 (E.D. Pa. 2011); Tate v. W. Norriton Twp., 545 F. Supp. 2d 480, 487 (E.D. Pa. 2008)(citing Hock, 728 A.2d at 943 (Pa. 1999)).  The Supreme Court of Pennsylvania has indicated that, to violate Section 5503(a)(1), speech must constitute "fighting words," that is, under the circumstances, the words "risked an immediate breach of the peace." Hock, 728 A.2d at 846 (citing Chaplinsky, supra).  Such words belong to a "small class[.]" Texas v. Johnson, 491 U.S. 397, 409 (1989).  The small class of "fighting words" is limited because, otherwise, it would be inconsistent with the general principles of free speech. See id. at 408–09 (quoting Terminiello, 337 U.S. at 4).

In Hock, a Pennsylvania Supreme Court case, the Commonwealth contended that the words, "Fuck you, asshole," constituted a violation of Section 5503(a)(1) when directed at a municipal police officer, relying upon a previous decision of the Pennsylvania Supreme Court to equate "fighting words" with disorderly conduct.  728 A.2d at 944, 946.  The Hock court disagreed that such

an epithet constituted "fighting words" and concluded that the officer lacked

probable cause to arrest the defendant for disorderly conduct. Id. at 946–47.

Pennsylvania's highest court has also stated:

> We recognize that the police often place their lives in jeopardy to ensure the safety of the citizenry and thus perform a task that is valuable, necessary and, at times, heroic.
>
> Accordingly, the prospect of a citizen verbally abusing a police officer appears particularly objectionable. It does not follow, however, that Section 5503(a) may be used as a vehicle to protect the police from all verbal indignities, especially under the dubious hypothesis that officers are likely to break the law when affronted. The police must expect that, as part of their jobs, they will be exposed to daily contact with distraught individuals in emotionally charged situations. See generally Commonwealth v. Weiss, 340 Pa.Super. 427, 434, 490 A.2d 853, 856 (1985).
>
> Moreover, the offense of disorderly conduct is not intended as a catchall for every act which annoys or disturbs people; it is not to be used as a dragnet for all the irritations which breed in the ferment of a community. It has a specific purpose; it has a definite objective, it is intended to preserve the public peace; it has thus a limited periphery beyond which the prosecuting authorities have no right to transgress any more than the alleged criminal has the right to operate within its clearly outlined circumference. Greene, 410 Pa. at 117, 189 A.2d at 145.

Id. at 947.

In light of the above Pennsylvania jurisprudence, Castro's first vulgar

remark to Debias did not supply enough objective facts to establish probable

cause for a disorderly conduct arrest.  And when viewing the record in Castro's

22

favor, as is required at this posture, the plaintiff's subsequent taunts and vulgar remarks resulted from the defendant officer: 1) abruptly returning to the hallway to tell the plaintiff to "watch [his] step," 2) threatening the plaintiff with arrest, 3) pointing his finger in the plaintiff's face, 4) grabbing the plaintiff, and 5) pushing him toward the exit of a public building.

In such context, Castro's statements of: 1) "Arrest me!" 2) "What you going to do?" 3) "You don't want to do your job." 4) "You don't like to do your job." 5) "I told you!" 6) "Go ahead, touch me." 7) "You assaulted me right now!" 8) "Why are you pushing me?" 9) "No, I stop nothing." and even 10) "Fuck you!" do not rise to the level of "fighting words" as that class of words has been narrowed by the United States Supreme Court since <u>Chaplinsky</u>.

In contrast to Debias's physical conduct, Castro's words were not accompanied by gestures objectively showing a desire to fight the defendant officer.  Castro responded to Debias reemerging from secure police department area by holding his arms outward at his sides with his hands open. (Doc. 40-2, Debias Video 1, 1:53).  Castro also offered little physical resistance after being turned, pushed, grabbed, and shoved out of the police department hallway. (<u>Id.</u> at 2:04-2:20).  Looking at both Castro's words and conduct at this posture, the defendant did not have objective facts available to him to arrest the plaintiff for violating Section 5503(a)(1).

Turning next to Section 5503(a)(2), "a person is guilty of disorderly conduct if, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof, he…makes unreasonable noise." 18 PA. CONS. STAT. § 5503(a)(2).  Unreasonable noise is defined under Pennsylvania law as "not fitting or proper in respect to the conventional standards of organized society or a legally construed community." Mastrangelo, 414 A.2d 58 (quoting Greene, 189 A.2d at 143)).  "Mere annoyance to the public may not suffice." Commonwealth v. Gowan, 582 A.2d 879, 882 (1990).

Four factors have been recognized by the Superior Court of Pennsylvania as relevant to the "unreasonable noise" determination: "(1) the volume of the noise; (2) the duration of the noise; (3) the time of day; and (4) whether the noise was reported to the police." McNeil v. City of Easton, 694 F. Supp. 2d 375, 391 (E.D. Pa. 2010) (citing Commonwealth v. Maerz, 879 A.2d 1267 (Pa. Super. 2005); Commonwealth v. Alpha Epsilon Pi, 540 A.2d 580 (1988))

In applying these factors, the court notes that any noise caused by Castro at the rear exit of Hazleton City Hall lasted for approximately forty (40) seconds and the plaintiff's volume was equally matched by the volume of Debias's voice.  Such noise also occurred in a city municipal building while open to the public.  It does not appear that anyone other than the parties was in the vicinity.  Moreover, it does not appear that the parties disrupted any other city business or impaired

the work of other city employees outside of the police department area. Finally, Debias is a police officer, and when the objective facts of record are viewed in a light most favorable to Castro, the videos can reasonably lead to a conclusion that the defendant escalated this matter from routine police business to a physical confrontation with the plaintiff based on the plaintiff's remarks and video recording. Consequently, upon consideration of these "unreasonable noise" factors, Debias did not have objective facts available to arrest Castro for violating Section 5503(a)(2).

Moving on to Section 5503(a)(3), this subsection requires obscene language or an obscene gesture. A review of Pennsylvania law indicates that this subsection is plainly inapplicable because Castro's remarks lacked a sexual component.[7] See Commonwealth v. Johnson, 327 A.3d 265, 269-70 (Pa. Super. Ct. 2024)(collecting cases); Commonwealth v. Kelly, 758 A.2d 1284, 1288 (Pa. Super. Ct. 2000).

---

[7] Section 5503(a)(3) is inapplicable based on Pennsylvania's application of the test from Miller v. California, 413 U.S. 15 (1973). Kelly, 758 A.2d at 1286. The Superior Court of Pennsylvania has reversed disorderly conduct convictions under Section 5503(a)(3) where the defendant yelled "fuck the police" or other similar statements. Johnson, 327 A.3d at 269 (collecting cases); see also Brockway v. Shepherd, 942 F.Supp. 1012, 1016 (M.D. Pa.1996) ("using a base term for sex does not change the disrespectful, offensive communication into one that appeals to the prurient interest.").

Thus, the constitutional analysis of the false arrest claim turns on whether Debias had objective facts amounting to probable cause as to arrest Castro with the offense listed on the citation, Section 5503(a)(4).  In Pennsylvania, "[a] person is guilty of disorderly conduct if, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof, he…creates a hazardous or physically offensive condition by any act which serves no legitimate purpose of the actor." 18 PA. CONS. STAT.  § 5503(a)(4).

An act "serves no legitimate purpose" if it is not constitutionally protected. Commonwealth v. Roth, 531 A.2d 1133, 1139 (Pa. Super. Ct. 1987) (discussing Commonwealth v. Duncan, 363 A.2d at 803 (1976)).  On that note, the Supreme Court of the United States has indicated that "[t]he freedom of individuals verbally to oppose or to challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state." City of Houston v. Hill, 482 U.S. 451, 462–63 (1987).  Castro's speech, while vulgar and condescending, fits within that category as discussed above. Additionally, Castro's right to record police activity in public is constitutionally protected. Fields v. City of Philadelphia, 862 F.3d 353, 359 (3d Cir. 2017).

The remainder of Section 5503(a)(4) is also inapplicable to these facts.  "A 'hazardous' condition is one which engenders 'danger or risk.' " Vanderklok v. United States, 140 F. Supp. 3d 373, 383 (E.D. Pa. 2015), aff'd, 774 F. App'x 73

26

(3d Cir. 2019)(quoting <u>Roth</u>, 531 A.2d at 1137).  "The dangers and risks against which the disorderly conduct statute are directed are the possibility of injuries resulting from public disorders." <u>Commonwealth v. Williams</u>, 574 A.2d 1161, 1164 (Pa. Super. Ct. 1990).  "By contrast, the meaning of 'physically offensive condition' 'encompasses direct assaults on the physical senses of members of the public' as opposed to 'merely morally offensive' conduct." <u>Commonwealth v. Coniker</u>, 290 A.3d 725, 735 (Pa. Super. Ct. 2023)(quoting <u>Commonwealth v. McConnell</u>, 244 A.3d 44, 49 (Pa. Super. Ct. 2020)).  Examples include: setting off a "stink bomb," strewing rotting garbage in public places, or shining blinding lights in the eyes of others.  <u>Williams</u>, 574 A.2d at 1164.

Castro was armed only with his camera and his mouth.  His words and conduct at Hazleton City Hall did not amount to assaults on anyone's physical senses.  Moreover, given the absence of other people in this area of the building besides the parties, the plaintiff's behavior neither placed Debias nor any third-party at risk of injury.  So, just as with the other subsections of the disorderly conduct statute, Debias did not have the objective facts to justify a Section 5503(a)(4) arrest when the videos are viewed in Castro's favor.

Continuing on to Castro's retaliatory arrest claim, if the plaintiff establishes the absence of probable cause, as is the outcome of the analysis above, then the

test from <u>Mt. Healthy City Bd. of Ed. v. Doyle</u>, 429 U.S. 274 (1977) governs that claim:

> The plaintiff must show that the retaliation was a substantial or motivating factor behind the [arrest], and, if that showing is made, the defendant can prevail only by showing that the [arrest] would have been initiated without respect to retaliation.

<u>Nieves</u>, 587 U.S. at 404 (quoting <u>Lozman v. Riviera Beach</u>, 585 U.S. 87, 97 (2018)); see also <u>Hartman</u>, 547 U.S. at 265–66.

Additionally, to prevail on a First Amendment retaliation claim, a plaintiff must establish that: (1) he engaged in conduct protected by a constitutional right; (2) the defendant engaged in retaliatory action sufficient to deter person of ordinary firmness from exercising his constitutional rights; and (3) a causal link existed between protected activity and retaliatory action. <u>Falcone</u>, 92 F.4th at 205 (citing <u>Palardy v. Township of Millburn</u>, 906 F.3d 76, 80-81 (3d Cir. 2018))(cleaned up).

As indicated, Castro engaged in conduct protected by the First Amendment. Furthermore, "[t]here is no dispute that an arrest constitutes conduct 'sufficient to deter a person of ordinary firmness from exercising his constitutional rights.' " <u>Id.</u> (quoting <u>Palardy</u>, supra; <u>Thomas v. Independence Twp.</u>, 463 F.3d 285, 296 (3d Cir. 2006))(alteration removed). On the element of causation:

> It is not enough to show that an official acted with a
> retaliatory motive and that the plaintiff was injured—the
> motive must *cause* the injury. Specifically, it must be a
> "but-for" cause, meaning that the adverse action against
> the plaintiff would not have been taken absent the
> retaliatory motive.

Nieves, 587 U.S. at 398–99 (discussing Hartman, 547 U.S. at 260).

When the parties' words and conduct in the chain of events are reviewed in Castro's favor, there is both direct and circumstantial evidence that Debias would not have arrested the plaintiff but-for a retaliatory motive arising from the plaintiff's speech and video recording. Consequently, after an analysis of the first prong of the qualified immunity test on a summary judgment standard of review, Castro can demonstrate violations of his First and Fourth Amendment rights by the defendant. As for the ultimate determination of whether Debias actually violated Castro's rights, that task is not for the court.

### b.    Whether the Law Was Clearly Established

One task does remain in resolving the defendant's assertion of qualified immunity, that is, "the court must decide whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." Pearson, 555 U.S. 223, 232 (citing Saucier, 533 U.S. at 201). "A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.' " Mullenix v. Luna, 577 U.S. 7, 11 (2015) (quoting Reichle v. Howards, 566 U.S. 658, 664 (2012)). Under Supreme Court

precedent, "the clearly established right must be defined with specificity." <u>City of Escondido, Cal. v. Emmons</u>, 586 U.S. 38, 42 (2019).  The court thus frames the right considering the specific context of the case, as the right needs to be specific enough to put every reasonable official on notice of it.  <u>See Fields</u>, 862 F.3d at 361 (citation omitted).

"To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent. The rule must be settled law. . .which means it is dictated by controlling authority or a robust consensus of cases of persuasive authority." <u>Wesby</u>, 583 U.S. at 63.  Clearly established rights are derived either from binding United States Supreme Court and Third Circuit Court of Appeals precedent or from a robust consensus of cases of persuasive authority from other circuits.  <u>See James v. N.J. State Police</u>, 957 F.3d 165, 170 (3d Cir. 2020); <u>Bland v. City of Newark</u>, 900 F.3d 77, 84 (3d Cir. 2018)).

The foundation of law in this case has been sufficiently clear for some time. Plaintiff's First Amendment right to record the police is clearly established. <u>Fields</u>, 862 F.2d at 356.  Plaintiff's First Amendment right to criticize the police is also clearly established.  <u>City of Houston</u>, 482 U.S. at 461.  Plaintiff's right to use profane language in his police criticism is also clearly established.[8] <u>Johnson</u>, 332

---

[8] In addition to <u>Johnson</u>, a robust consensus of cases from other circuits at the time of Castro's arrest stand for the proposition that the police cannot use disorderly conduct statutes to punish people for merely saying contemptuous things to police officers.  <u>Provost v. City of Newburgh</u>,

F.3d at 212.  Such a right clearly exists up to the point where his words "must be nothing less than 'an invitation to exchange fisticuffs.' " <u>Id.</u>, 332 F.3d at 212 (quoting <u>Texas v. Johnson</u>, 491 U.S. at 409).  Moreover, "the law is settled that as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions, including criminal prosecutions, for speaking out." <u>Hartman</u>, 547 U.S. at 256.

Additionally, "the Fourth Amendment prohibits a police officer from arresting a citizen except upon probable cause." <u>Orsatti v. N.J. State Police</u>, 71 F.3d 480, 482 (3d Cir. 1995)(citing <u>Papachristou v. City of Jacksonville</u>, 405 U.S. 156, 169 (1972)).  "Defendants will not be immune if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that" there was probable cause.  See <u>Malley</u>, 475 U.S. at 341 (discussing the <u>Harlow</u> standard in the context of seeking an arrest warrant).  "[B]ut if officers of reasonable competence could disagree on this issue, immunity should be recognized." <u>Id.</u> at 341.  All told, "officers are entitled to qualified immunity when they 'reasonably but mistakenly conclude that probable cause is present[.]' " <u>Lozano</u>, 9 F.4th at 246 (quoting <u>Anderson</u>, 483 U.S. at 641); <u>see also</u> <u>Curley</u>, 499

---

262 F.3d 146, 159 (2d Cir. 2001); <u>Payne v. Pauley</u>, 337 F.3d 767, 777 (7th Cir. 2003); <u>Greene v. Barber</u>, 310 F.3d 889, 892 (6th Cir. 2002); <u>Buffkins v. City of Omaha</u>, 922 F.2d 465 (8th Cir. 1990); <u>Thurairajah v. City of Fort Smith, Arkansas</u>, 925 F.3d 979, 985 (8th Cir. 2019); <u>Duran v. City of Douglas</u>, 904 F.2d 1372 (9th Cir. 1989); <u>United States v. Poocha</u>, 259 F.3d 1077, 1082 (9th Cir. 2001); <u>Guffey v. Wyatt</u>, 18 F.3d 869, 872 (10th Cir. 1994).

at 207 ("The second step…addresses whether, if there was a wrong…the officer made a reasonable mistake about the legal constraints on his actions and should therefore be protected against suit[.]").

As the record is postured, it cannot be said that a reasonable officer would find probable cause to arrest Castro for disorderly conduct. That is so because Castro's First Amendment rights are so well-established here. Consequently, Castro has provided sufficient record evidence to support a set of facts under which there would be no immunity. And accordingly, Debias's motion for summary judgment will be denied.

**Conclusion**

For the reasons set forth above, the defendant's motion for summary judgment (Doc. 6) will be denied. An appropriate order follows.

Date: 3/12/25

JUDGE JULIA K. MUNLEY
United States District Court